**INDIANA CIVIL RIGHTS COMMISSION, Jodie L. Jackson and Larry J. Stovall, Appellants–Respondents,**

v.

**Clyde ALDER and Barbara Jean Alder, d/b/a Stoney Pike Mobile Home Park, Appellees–Petitioners.**

No. 09A02–9611–CV–697.

Court of Appeals of Indiana.

Dec. 29, 1997.

Jacquelyn Thompson, Indianapolis, for Appellants–Respondents.

Jay T. Hirschauer, Hirschauer & Hirschauer, Logansport, for Appellees–Petitioners.

**OPINION**

BAKER, Judge.

In this appeal, we examine the scope of the Indiana Civil Rights Commission's remedial powers and revisit the issue of whether the commission can assess punitive and emotional distress damages pursuant to the Indiana Civil Rights Act. Specifically, appellants-respondents the Indiana Civil Rights Commission, Jodie L. Jackson and Larry J. Stovall appeal the trial court's reversal, in part, of the ICRC's order assessing $2,330 in damages against appellees-petitioners Clyde Alder and Barbara Alder, doing business as Stoney Pike Mobile Home Park (Alders), for denying Jackson and Stovall housing in the mobile home park on the basis of race. The ICRC presents several issues for our review, which we consolidate and restate as follows: (1) whether the trial court erred by failing to find that Stovall was denied equal opportunity in housing; and (2) whether the ICRC

properly awarded Jackson and Stovall emotional distress and punitive damages. On cross-appeal, the Alders present one issue for our review, which we restate as whether the trial court erred by upholding the ICRC's award of out-of-pocket expenses to Jackson.

### FACTS [1]

In 1985, Jodie Jackson, her husband, Allen, and their two children, all of whom are white, moved into the Stoney Pike Mobile Home Park, which had been owned and operated by the Alders since 1974. Approximately two years later, Jackson and Allen divorced. Although park rules prohibited more than one family to live in each mobile home, Allen continued to live in the mobile home with Jackson and her children for the next nine months. The Alders, however, did not attempt to evict Jackson or her ex-husband.

In September of 1989, Jackson met Stovall, who is an African–American male. Several months later, in January of 1990, Stovall began visiting Jackson at her mobile home and occasionally spent the night. Thereafter, Stovall and several other black men were frequently observed at Jackson's trailer. After the Alders discovered that Stovall and two of his black friends had stayed overnight at Jackson's residence on April 18, 1990, they placed a copy of the park rules in Jackson's mailbox, noting that only "[o]ne family [was allowed] per mobile home, NO EXCEPTIONS or you can move within 30 days." Record at 727.

Shortly after Jackson received this warning, she confronted the Alders and informed them that none of the men were residing with her. According to Jackson, Clyde Alder then responded that she would have to move her mobile home because he did not want "people of that kind" in his trailer park. R. at 496. When she asked him what kind of people he meant, Clyde stated "black people, colored people." R. at 497. Clyde contends, however, that he never made these statements.

Thereafter, the Alders filed a notice to eject Jackson from the mobile home park, claiming that Jackson was violating park rules by allowing adult males to spend the night in her mobile home. During a hearing

on the claim on May 7, 1990, Jackson testified that she would never permit a man to move into the mobile home unless her parents, who owned the mobile home, approved. R. at 697. Because her parents did not approve of Jackson dating a black man, she stated that she·would not allow Stovall to move into the home. R. at 698. Following the hearing, the trial court denied the Alders' claim for ejectment, finding that they had not provided sufficient evidence that Stovall and the other men were actually living with Jackson. However, the court informed Jackson that if she continued to allow Stovall or any other adults to stay overnight, they would be considered more than occasional guests and the Alders would have a claim for ejectment.

After the hearing, Jackson sent a letter to the Alders offering to pay additional rent for overnight guests. Alder contends, however, that he never received the letter. Thereafter, Clyde Alder observed men coming out of Jackson's mobile home on several other occasions, prompting him to file a second notice of ejectment. However, on June 7, 1990, Jackson's mother sent a letter to the Alders, informing them that they had made arrangements to move the trailer. Thereafter, the mobile home was removed from the park.[2]

On July 6, 1990, Jackson and Stovall both filed complaints with the ICRC, claiming that they had been denied housing on the basis of race. Specifically, Jackson alleged that the Alders caused her to move from the park because of her association with Stovall, while Stovall alleged that the Alders refused to allow him to move into the park due to his race. Following a consolidated hearing on the complaints on January 22, 1993, the ICRC's hearing officer entered proposed findings of fact and conclusions of law, determining that the Alders had sought to evict Jackson because of her association with black men and that Stovall was prohibited from staying overnight as a guest or becoming a co-resident because of his race. As a result, the hearing officer awarded Jackson $1,897.96 for her expenses in removing the mobile home from the park, $80 for her emotional distress and $100 in punitive dam-

---

1. Oral argument was held on October 29, 1997, in Indianapolis.

2. The record is unclear as to the disposition of the second ejectment action.

ages. The hearing officer also awarded Stovall $15 for his out-of-pocket losses, $35 for emotional distress and $200 in punitive damages. He then ordered the Alders to do the following: (1) cease and desist from discriminating against residents, guests and applicants for lots in the park due to race; (2) give priority to qualified black applicants who apply for rental of a lot until three lots are inhabited by black adults; (3) immediately give notice to tenants and applicants of their compliance with nondiscriminatory housing practices; (4) comply with ICRC reporting requirements through the year 2000; (5) advertise for minority tenants in a local newspaper each day for four weeks; and (6) arrange to move and reinstall the mobile home on Jackson's former lot in the park or, if the home is no longer moveable, provide, at their expense, a mobile home of equal or greater size which is reasonably acceptable to Jackson's parents. On April 23, 1993, the ICRC issued a final order, adopting the hearing officer's proposed findings and conclusions with minor modifications.

On May 18, 1993, the Alders filed a petition for judicial review. After a hearing on March 22, 1995, the trial court affirmed in part and reversed in part the ICRC's final order. In particular, the court found that there was substantial evidence to support the ICRC's finding of discrimination against Jackson and its award of out-of-pocket losses to her. However, the court concluded that the ICRC exceeded its statutory authority by ordering the Alders to vacate the lot and reinstall Jackson's mobile home and by assessing punitive and emotional distress damages. The trial court did not enter any findings with regard to the ICRC's finding of discrimination against Stovall or its award to him of $15 for out-of-pocket losses. This appeal followed. Additional facts will be supplied as necessary.

## DISCUSSION AND DISCUSSION

### I. Standard of Review

■ Initially, we note our standard of review. When reviewing a decision of an administrative agency, appellate courts stand in the same position as the trial court. *State Bd. of Registration for Land Surveyors v. Bender,* 626 N.E.2d 491, 496 (Ind.Ct.App. 1993). On appeal, we are limited to deter-

mining whether the agency possessed jurisdiction over the subject matter, and whether the agency's decision was made pursuant to proper procedures, was supported by substantial evidence, was not arbitrary or capricious and was not in violation of any constitutional, statutory or legal principles. *Natural Resources Comm'n v. Sugar Creek Mobile Estates,* 646 N.E.2d 61, 63–64 (Ind.Ct.App. 1995), *trans. denied.* We review the record in the light most favorable to the administrative proceedings and are prohibited from re-weighing the evidence or judging the credibility of witnesses. *Id.* at 64. Additionally, we are bound by the agency's findings of fact if supported by substantial evidence. *Hamilton County Dep't of Public Welfare v. Smith,* 567 N.E.2d 165, 167–68 (Ind.Ct.App. 1991). However, we are not bound by an agency's interpretation of the law. *Ashlin Transp. Serv., Inc. v. Indiana Unemployment Ins. Bd.,* 637 N.E.2d 162, 165 (Ind.Ct. App.1994). Although an agency's interpretation of the statutes and regulations which it is charged to enforce is entitled to some weight, the interpretation of a statute or rule is the responsibility of the court and within the exclusive province of the judiciary. *Miller Brewing Co. v. Bartholemew County Beverage Co., Inc.,* 674 N.E.2d 193, 200 (Ind.Ct. App.1996), *trans. denied.*

### II. Discrimination against Stovall

■ The ICRC first contends that the trial court erred by failing to find that Stovall was denied equal opportunity in housing on the basis of race. Specifically, the ICRC contends that there was substantial evidence presented at the hearing demonstrating that Stovall was prohibited from staying overnight as Jackson's guest or becoming a co-resident at the park because of his race. Therefore, the ICRC argues that the trial court should have affirmed the commission's finding of discrimination against Stovall and its award of out-of-pocket losses to him. We disagree.

■ The purpose of Indiana's Civil Rights Act, with regard to discriminatory housing practices, is to provide equal opportunities in the "*acquisition through purchase or rental of real property including but not limited to*

housing...." IND.CODE § 22–9–1–2(a) (emphasis added). In order to establish a prima facie case of racial discrimination in housing under this statute, a claimant must present evidence of the following: (1) the claimant is a member of a racial minority; (2) the claimant applied for and was qualified to purchase or rent certain property; (3) the claimant was rejected; and (4) the purchase or rental opportunity remained available thereafter. *Indiana Civil Rights Comm'n v. Wellington Village Apartments,* 594 N.E.2d 518, 529 (Ind.Ct.App.1992), *trans. denied.*

Here, the record reveals that Stovall never applied for or otherwise requested housing in the mobile home park. R. at 587–88. In fact, Stovall testified that he never met the Alders prior to the hearing. R. at 587–88. Further, Stovall testified that he already had an apartment and did not have any plans to move in with Jackson. R. at 583–85. Finally, Stovall admitted that he had not lost any money as a result of Jackson removing the mobile home from the park. R. at 583, 589. Considering that Stovall never applied to move into the mobile home park, we cannot conclude that he was denied an equal opportunity to purchase or rent housing. Thus, the trial court did not err by failing to affirm the commission's finding of discrimination against Stovall and its award of out-of-pocket losses to him.

### III. Emotional Distress and Punitive Damages

The ICRC also argues that the trial court erroneously concluded that the commission exceeded its authority by awarding emotional distress and punitive damages. Although the ICRC concedes that this court has recently and repeatedly held that emotional distress and punitive damages are not recoverable under the Civil Rights Act, it contends that we should reconsider our decision for the following reasons: (1) our past decisions rest on an erroneous interpretation of the Civil Rights Act because the Act expressly empowers the ICRC to restore a complainant's losses and only limits the type of losses that may be recovered in the context of employment discrimination; and (2) the denial of emotional distress damages resulting from intentional housing discrimination violates the Equal Protection Clause of the Four-

teenth Amendment of the United States Constitution. We will address each argument in turn.

### A. Past Interpretations of Indiana's Civil Rights Act

■ IND.CODE § 22–9–1–6(k)(1) sets forth the remedial powers of the ICRC and provides, in pertinent part, as follows:

[I]f the commission finds a person has engaged in an unlawful discriminatory practice, [it] shall cause to be served on this person an order requiring the person to cease and desist from the unlawful discriminatory practice and requiring the person to take further affirmative action as will effectuate the purposes of this chapter, including but not limited to the power:

(A) to restore a complainant's losses incurred as a result of discriminatory treatment, as the commission may deem necessary to assure justice; however, this specific provision when applied to orders pertaining to employment shall include only wages, salary, or commissions....

We first addressed the ICRC's authority to compensate complainants, pursuant to this section, in *Indiana Civil Rights Comm'n v. Holman,* 177 Ind.App. 648, 380 N.E.2d 1281 (1978). In *Holman,* this court held that the ICRC exceeded its statutory authority by awarding a tenant $1,000 in damages as compensation for a landlord's racial insult. *Id.,* 380 N.E.2d at 1285. In particular, we noted that "the losses referred to in [section 6(k)(1)] are pecuniary losses which can be proved with some degree of certainty, such as where a person has been denied employment or living accommodations, or business in violation of the Civil Rights Act where that violation results in actual pecuniary loss." *Id.* Because a racial insult did not result in actual pecuniary loss and the statute did not specifically empower the ICRC to award this type of damages, we concluded that the ICRC was prohibited from giving such an award. *Id.* Based on the *Holman* decision, this court has repeatedly reversed the ICRC's award of emotional distress and punitive damages under the Civil Rights Act. *See, e.g., Indiana Civil Rights Comm'n v. Washburn Realtors, Inc.,* 610 N.E.2d 293,

297 (Ind.Ct.App.1993) (commission exceeded authority by awarding emotional distress damages to tenant who was denied an apartment due to race); *Wellington Village*, 594 N.E.2d at 530–31 (same); *Indiana Civil Rights Comm'n v. Union Township Trustee*, 590 N.E.2d 1119 (Ind.Ct.App.1992) (commission exceeded authority by awarding emotional distress and punitive damages to employee for employer's inappropriate sexual advances), *trans. denied; Crutcher v. Dabis*, 582 N.E.2d 449, 451 (Ind.Ct.App.1991) (ICRC's award of $28,000 for emotional distress and $2,000 for punitive damages to interracial married couple who were denied housing due to race exceeded statutory authority), *trans. denied.*

Although we have repeatedly found that the ICRC's attempts to award these types of damages exceeded its statutory authority, the ICRC again urges us to overrule *Holman* and its progeny because these decisions misconstrue the meaning of the term "losses" as used in section 6(k)(1). We decline such an invitation. Despite our holdings prohibiting the award of emotional distress and punitive damages, the legislature has not amended the Civil Rights Act to provide the ICRC with the power to award emotional distress and punitive damages. In fact, the legislature has recently declined to enact proposed legislation providing for the award of emotional and punitive damages for racial and sexual discrimination and harassment. *See, e.g.,* H.B. 1078, 107th General Assembly, 1st Session (1991) (proposal providing for award of attorney's fees, actual damages and punitive damages for discrimination against an employee due to race, color or national origin); S.B. 590, 108th General Assembly, 1st

Session (1993) (proposal providing ICRC with authority to restore losses as allowed under federal civil rights laws, which includes emotional distress damages, for sexual harassment). Moreover, our supreme court has repeatedly denied transfer in these cases. Given our consistent interpretation of this statute and the legislature's acquiescence, we decline the ICRC's invitation to overrule *Holman* and once again affirm our holding that the ICRC is precluded from awarding emotional distress and punitive damages pursuant to section 6(k)(1).[3]

## B. Equal Protection

The ICRC also contends that this court's interpretation of section 6(k) to deny emotional distress damages to victims of housing discrimination violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[4] Specifically, the ICRC argues that our interpretation of section 6(k)(1) results in an arbitrary classification which treats victims of discrimination who suffer emotional distress differently than other persons who suffer emotional distress as a result of another person's wrongful acts. We disagree.

The Fourteenth Amendment of the United States Constitution provides, in pertinent part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Here, the ICRC essentially claims that our interpretation of section 6(k)(1) denies victims of discrimination the equal protection of the laws because it prohibits them from recovering emotional distress damages, whereas individuals who are victims of tortious conduct, such as trespass or assault, are permitted to recover emotion-

**3.** Despite our past decisions, we note that the ICRC has continued to award emotional distress and punitive damages and has repeatedly raised this issue before this court. The instant case is a prime example. We question the ICRC's continued expenditure of public funds to continually relitigate an established rule of law. If the ICRC desires additional power to ensure the public's compliance with the Civil Rights Act, it should present its request to the legislature, not our courts. Although the Alders have not requested attorney's fees in the present case, we do not condone the continued disregard of our precedent.

**4.** The ICRC also argues that our interpretation of this provision violates the Equal Privileges and

Immunities Clause of Article 1, § 23 of the Indiana Constitution. In its brief, however, the ICRC contends that the analysis under § 23 is identical to federal equal protection analysis. As our supreme court recently explained, Article 1, § 23 is not identical to the Equal Protection Clause and should be given independent interpretation and application. *Collins v. Day*, 644 N.E.2d 72, 75 (Ind.1994). Because the ICRC has failed to do so, its argument under Article 1, § 23 is waived. *See Humphrey v. State*, 680 N.E.2d 836, 842 n. 11 (Ind.1997) (failure to cite authority or present cogent argument results in waiver on appeal).

al distress damages. Unlike trespass or assault, however, Indiana has never recognized a tort of discrimination. Rather, the legislature enacted the Civil Rights Act to provide a right of recovery to victims of discrimination where one did not previously exist. Therefore, instead of denying certain privileges and immunities to victims of discrimination, the statute, and our interpretation of its provisions, affords additional protection and privileges to these individuals.

Further, our interpretation of the Civil Rights Act does not necessarily preclude a victim of discrimination from recovering emotional distress and punitive damages. As the ICRC notes, Indiana recognizes the tort of the intentional infliction of emotional distress. *Cullison v. Medley,* 570 N.E.2d 27 (Ind.1991). Pursuant to this cause of action, a victim of discrimination may potentially recover damages for her mental anguish. However, the mere fact that an individual was subjected to discrimination does not necessarily entitle him or her to emotional distress damages. As our supreme court stated, "[i]t is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress." *Id.* at 31. Thus, a victim of discrimination may still recover emotional distress damages by filing a civil action and proving that the discrimination was intentionally designed to

harm him or her emotionally.[5] Under these circumstances, we conclude that our interpretation of the Civil Rights Act does not violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[6]

### IV. Jackson's Out–of–Pocket Losses

■ Finally, we address the Alders' claim that the trial court erred by upholding the ICRC's award of out-of-pocket expenses to Jackson. Specifically, the Alders contend that there was no evidence in the record that Jackson incurred any expenses in moving the mobile home from the park. We disagree.

■ In the present case, it is undisputed that Jackson was living in her parents mobile home. Further, the record reveals that Jackson's parents obtained a loan to pay a portion of the costs to remove the mobile home from the park, which they have since repaid. R. at 519–21. However, the record also reveals that Jackson paid the remainder of the expenses involved in moving the mobile home. R. at 525, 541–42, 546. Additionally, Jackson repeatedly testified that she was obliged to repay her parents for moving the mobile home. R. at 521, 541. This evidence clearly indicates that Jackson suffered a pecuniary loss. As a result, the trial court did not err by affirming the ICRC's award of out-of-pocket expenses to Jackson.[7]

---

5. Limiting the manner in which emotional distress and punitive damages may be awarded also provides safeguards against the unfair imposition of such damages. For example, in a civil action, an award of emotional distress damages only occurs if the plaintiff can prove his or her claim and damages, pursuant to strict rules of evidence and procedure, by a preponderance of the evidence. Additionally, the defendant also has the opportunity to exercise his right to a trial by jury. In contrast, a claim of discrimination is tried before an administrative agency, without strict adherence to the rules of evidence and without affording the defendant the right to a jury trial. Further, the agency's award of damages does not require the same level of proof. Rather than a preponderance of the evidence standard, the agency's damage award is upheld if substantial evidence exists to support it.

6. In its brief, the ICRC also argues that the trial court erroneously concluded that the commission exceeded its statutory authority by ordering the Alders to either reinstall Jackson's parents' mobile home in the park or provide Jackson with a mobile home of equal or greater size in exchange for the title on her parents' mobile home. Dur-

ing oral argument, however, the parties stipulated to the fact that the mobile home owned by Jackson's parents is no longer in existence, making it impossible to reinstall the mobile home or provide a comparable mobile home in exchange. We also note that the Alders agreed to set aside a lot for Jackson if she desires to move back to the park. Under these circumstances, this issue is now moot and we need not address it on appeal.

7. In their brief, the Alders also argue, in one sentence, that the evidence was insufficient to support the ICRC's finding of discrimination against Jackson. Other than this brief assertion, however, the Alders have failed to explain how the evidence was deficient or cite a single authority in support of their argument. Apparently aware of this deficiency, the Alders also contend that "it is impossible to brief this issue" because the ICRC failed to provide a transcript of the proceedings before the trial court in the record. Appellee's Brief at 27. However, the Alders have also failed to explain how the lack of a trial transcript precludes our review, especially considering that we have the transcript of the hearing held before the ICRC. As a result, this issue

*CONCLUSION*

In sum, we conclude that the trial court did not err by failing to affirm the commission's finding of discrimination against Stovall or its award of out-of-pocket expenses to him. Further, the trial court properly determined that the ICRC exceeded its statutory authority by awarding emotional distress damages and punitive damages to Jackson and Stovall. Finally, we conclude that the trial court properly affirmed the ICRC's award of out-of-pocket expenses to Jackson.

Judgment affirmed.

NAJAM, J., concurs.

RUCKER, J., dissents with opinion.

RUCKER, Judge, dissenting:

I concur with the majority's decision upholding the Commission's award of out-of-pocket expenses to Jackson. I also concur with the majority's decision affirming the trial court's failure to enter a finding of discrimination against Stovall or to award him out-of-pocket losses. However, I must respectfully dissent from that portion of the majority opinion reversing the Commission's award of emotional distress damages.

For the reasons set forth in my dissent in *Indiana Civil Rights Comm'n v. Washburn Realtors, Inc.*, 610 N.E.2d 293, 297–99 (Ind. Ct.App.1993), I believe *Indiana Civil Rights Comm'n v. Holman*, 177 Ind.App. 648, 380 N.E.2d 1281 (1978) was wrongly decided and thus the majority's decision is based on precedent which is fundamentally flawed. As I stated in *Washburn*, awards of emotional distress damages represent a necessary component of the statutory mandate to enforce the remedial policies expressed in civil rights legislation. *Washburn*, 610 N.E.2d at 299 (Rucker, J., dissenting). Accordingly, I would apply the plain, everyday, and common meaning of the term "losses" in Ind.Code § 22–9–1–6(k) to include emotional distress damages. Such a construction is consistent with the statute's plenary grant of discretionary remedial power to the Commission as well as with the manifest purpose of the civil rights statute. *Id.* at 298, 299.

Further, the law is well settled that plaintiffs who suffer emotional distress as the result of intentional torts are permitted to recover damages if the tort is one which would foreseeably provoke an emotional disturbance of the kind normally to be aroused in the mind of a reasonable person. *Shuamber v. Henderson*, 579 N.E.2d 452, 455 (Ind. 1991); *Cullison v. Medley*, 570 N.E.2d 27, 30 (Ind.1991). The majority's application of I.C. § 22–9–1–6(k) operates to deny victims of civil rights violations emotional distress damages while the law grants such damages to victims of intentional torts. In my view such a distinction lacks a lawful basis. Accordingly, I find that the application of I.C. § 22–9–1–6(k) to deny compensatory damages to victims of housing discrimination violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution as well as the Equal Privileges Clause of Article 1, § 23 of the Indiana Constitution.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." The threshold question for federal equal protection analysis concerns the level of scrutiny. Those laws which involve a suspect classification, like race or alienage, and those that burden the exercise of fundamental rights, like reproduction or expression, receive the strictest scrutiny. *Department of Envtl. Management v. Chemical Waste Management, Inc.*, 643 N.E.2d 331, 337 (Ind. 1994). In order to survive strict scrutiny a state action must be a necessary means to a compelling governmental purpose and be narrowly tailored to that purpose. Statutes rarely survive this level of scrutiny. *Id.*

In this case the protected classes under the Civil Rights Act are race, religion, color, sex, disability, national origin, and ancestry. I.C. § 22–9–1–2. These are classifications grounded upon suspect traits. *See State v. Alcorn*, 638 N.E.2d 1242, 1245 (Ind.1994), *reh'g denied* (examples of suspect classes are race, gender, national/ethnic origin and alienage). Accordingly the application of I.C.

---

is waived. *See Humphrey,* 680 N.E.2d at 842 n. 11 (failure to cite authority or present cogent

argument results in waiver on appeal).

§ 22–9–1–6(k) to deny emotional distress damages to victims of civil rights violations must be a necessary means to a compelling governmental purpose and be narrowly tailored to that purpose. *See Chemical Waste Management*, 643 N.E.2d at 337. *Holman* and its progeny provide no compelling governmental purpose for denying such damages and I can discern none. The foreseeable result of housing discrimination is emotional injury and trauma. The federal courts have long so held. *See, e.g., United States v. Balistrieri*, 981 F.2d 916, 932 (7th Cir.1992), *cert. denied*, 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993) (the more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action); *Crumble v. Blumthal*, 549 F.2d 462, 467 (7th Cir.1977) (remanding for consideration of emotional damages based on plaintiff's testimony that he was "humiliated and embarrassed" by defendant's conduct); *Seaton v. Sky Realty Co., Inc.*, 491 F.2d 634, 636 (7th Cir.1974) (humiliation can reasonably be inferred from circumstances as well as established by testimony). Civil rights violations are serious affronts to an individual's personal dignity and the resulting emotional distress is as reasonably foreseeable in those cases as it is where an individual is the victim of an intentional tort. The unequal treatment between those protected under the Civil Rights Act and the larger class of persons who suffer emotional trauma as the result of another's wrongful acts violates the Equal Protection Clause.

The Equal Privileges Clause of Article 1, § 23 of the Indiana Constitution provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Where statutes confer unequal privileges or immunities to various classes of persons, two factors must be considered to determine whether the statute violates Article 1, § 23. First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes; and second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. *Collins v. Day*, 644

N.E.2d 72, 80 (Ind.1994). As to the first component of the test, it has repeatedly been said that the basis for the classification "must inhere in the subject matter." *Id.* at 78. Stated differently, where the legislature singles out one class of persons to receive a privilege or immunity not equally provided to others, such classification must be based upon distinctive, inherent characteristics which rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislation must be reasonably related to such distinguishing characteristics. *Id.* at 78–79.

I can discern no distinctive or inherent characteristics which rationally distinguish the class of victims of civil rights violations from the larger class of victims of intentional torts for purposes of the damages recoverable. As previously stated, a person who experiences the pernicious effects of discrimination suffers no less emotional trauma than does the person who is the victim of an intentional tort. In my view the application of I.C. § 22–9–1–6(k) to deny victims of discrimination emotional distress damages places an unequal burden upon victims of discrimination and thereby implicitly grants a special privilege or immunity to victims of intentional torts. Because emotional distress damages are unequally recoverable among differing classes which are not rationally distinguishable, the application of I.C. § 22–9–1–6(k) to deny such damages to victims of discrimination amounts to a violation of Article 1, § 23.

I agree with the majority that nothing precludes a victim of discrimination from recovering emotional distress damages by filing a civil action for intentional infliction of emotional distress. This is especially true where the victim's primary focus is the recovery of money damages for emotional trauma. However, in this case the Commission awarded Jackson the modest sum of $80.00 representing damages for her emotional distress. Clearly those damages were an incidental rather than a primary part of the action. The difference in focus was addressed in *State Human Rights Comm'n v. Pearlman Realty Agency*, 161 W.Va. 1, 239 S.E.2d 145 (1977). In that case the Human Rights Commission determined that the complainant had

been the victim of racial discrimination in housing and entered a remedial order requiring, among other things, that the perpetrator cease and desist from discriminatory practices, adopt an appropriate advertising program, make regular compliance reports to the Commission, and pay the complainant $1,000.00 "as compensation and damages for the humiliation, embarrassment, emotional and mental distress, and loss of personal dignity." *Id.*, 239 S.E.2d at 146. On appeal the court held that the Commission could, as part of its cease and desist order, award the complainant incidental damages as compensation for emotional and mental distress without proof of monetary loss. In so doing the court noted that victims of unlawful discrimination have access to the courts when the main object of their complaint is to recover damages. *Id.* at 148. However, the effect upon the defendant of an incidental monetary award to an injured party as part of a cease and desist order is to secure compliance with the Commission's order and to depress the discriminator's ambition to repeat the misbehavior. *Id.* at 147. "[A]n award of an incidental amount of money to a complainant is, from the defendant's perspective, nothing more or less than another facet of the Commission's powers of enforcement which require defendant to expend money in order to comply with the cease and desist order and secure his nondiscriminatory conduct in the future." *Id.* at 148.

In this case the legislative mandate grants the Commission the power to order a perpetrator to comply with a broad range of affirmative remedial actions. *See* I.C. § 22–9–1–6(k). Where, as here, a victim suffers incidental emotional distress damages as the result of such discrimination, the Commission should be permitted to compensate the victim as part of its larger mission of effectuating the statute's purposes.

For the foregoing reasons I would reverse that part of the trial court's order concluding that the Commission is without authority to assess emotional distress damages pursuant to the Indiana Civil Rights Act.